# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 16, 2003 Session

## STATE OF TENNESSEE v. SEDRICK WILLIAMS

**Direct Appeal from the Criminal Court for Knox County**
**No. 69597     Mary Beth Leibowitz, Judge**

---

**No. E2003-00659-CCA-R3-CD**
**March 1, 2004**

---

Following a jury trial, Defendant, Sedrick Williams, was found guilty of one count of first degree murder and one count of attempt to commit first degree murder. The trial court sentenced Defendant to life imprisonment for the first degree murder conviction. Following a sentencing hearing, the trial court sentenced Defendant to twenty-five years imprisonment for the attempted first degree murder conviction, and ordered his sentence for attempted first degree murder to run concurrently with his sentence for first degree murder. On appeal Defendant argues that the evidence was insufficient to support his convictions. Specifically, Defendant contends that the jury misapplied the law in rejecting his defense of self-defense, and the State failed to prove beyond a reasonable doubt that he acted with premeditation. Defendant also argues that the trial court's charge to the jury on flight, coupled with prosecutorial misconduct during closing argument, denied Defendant a fair trial. Defendant does not appeal his sentences. After a careful review of the record in this matter, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOE G. RILEY and NORMA McGEE OGLE, JJ., joined.

Richard L. Gaines and Kenneth F. Irvine, Jr., Knoxville, Tennessee (on appeal); and Charles Thomas, Knoxville, Tennessee (at trial), for the appellant, Sedrick Williams.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; Kevin Allen, Assistant District Attorney General; and Marsha Mitchell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Background

On the evening of October 10, 1997, Dramell Brockington, Sandie Johnson, and Defendant were gathered at Ms. Brockington's house. Ms. Brockington testified that she had dated Defendant for about two months, but the couple had broken up about two weeks prior to October 10 because of an argument. Defendant came by her house on October 9, and he and Ms. Brockington agreed to try to reconcile. Defendant did not spend the night at Ms. Brockington's house on October 9 but planned to stay over on October 10.

Maurice Widener, one of the victims, was Ms. Brockington's first cousin. Ms. Brockington and Mr. Widener had grown up together and were very close. Some time before October 10, Ms. Brockington told Mr. Widener that she and Defendant had argued and Defendant had spit on her during the course of the argument. Mr. Widener was upset over Defendant's behavior toward his cousin.

Mr. Widener and the other victim, Michael Dalton, were driving around drinking on October 10 and stopped by Ms. Brockington's house to visit. Ms. Brockington said that Defendant was on the front porch when Mr. Widener arrived. Defendant came into the house and told Ms. Brockington that she had "better get [her] family." Mr. Widener and Mr. Dalton entered the house, and all three men began arguing back and forth. Mr. Widener was also angry at Ms. Brockington for reconciling with Defendant. Ms. Brockington said that Defendant was mad and did not back down from the confrontation. Ms. Brockington tried to calm the men down. When they began to talk about fighting, she told Mr. Widener and Mr. Dalton to leave. Mr. Widener told Ms. Brockington that he was over the argument, and the two men left. Ms. Brockington said that she did not see any weapons during Mr. Widener's first visit.

Ms. Brockington said that Defendant was still mad after the men left and wanted to follow Mr. Widener, but Ms. Brockington would not let him leave the house. Ms. Brockington said that Defendant felt that Mr. Widener was "disrespecting" him. Defendant called his friend "Skull" and told him about Mr. Widener's lack of respect for Defendant. Defendant told him to come over to Ms. Brockington's house.

About fifteen minutes later, Ms. Brockington heard loud music from a car stereo system. She looked out the window and saw Mr. Widener pull up to the house again. Ms. Brockington told Defendant to stay in the house while she went outside to try to convince Mr. Widener to leave. Mr. Widener told her he "was through with it" and just wanted to go in the house. Mr. Widener brushed past Ms. Brockington and started to walk toward the house. Defendant stood behind the closed front door, watching Ms. Brockington and Mr. Widener. The door was a heavy security door with a glass window and a deadbolt lock. Ms. Brockington said that she could not hear if Defendant said anything while she was outside because of the closed door. Mr. Widener climbed up the front steps, gesturing with his hands, and said "This is my cousin's house." Defendant opened the door, stepped

out on the porch and said, "You're not going to run up on me no more." Ms. Brockington then heard three or four gun shots in quick succession and saw Mr. Widener fall down.

Ms. Brockington said that after the shooting, Defendant went back into the house while she knelt beside Mr. Widener. In a few minutes Defendant returned to the porch with a duffle bag. He jumped over Ms. Brockington and Mr. Widener and got in his car. Defendant told Ms. Brockington that he was sorry he had to do "that." At that time, Ms. Brockington did not know that Mr. Dalton had also been shot.

Ms. Brockington said that she did not see any weapons on Mr. Widener or Mr. Dalton and was not aware that Defendant owned a gun. Mr. Widener was wearing only shorts and sneakers and did not have a shirt on.

At the time of the shooting, Ms. Brockington said that she believed Defendant's last name was Parks because that was the name Defendant gave her when they began dating. Ms. Brockington denied that she had talked on the telephone with Defendant's mother or knew that his mother's last name at the time of the incident was Williams.

Ms. Brockington denied that Defendant lived with her although she admitted that Defendant sometimes spent the night at her house. Only Ms. Brockington's name was on the lease for the house, and she said that Defendant lived with his friend, Skull. On cross-examination, Ms. Brockington admitted that she had previously testified at Defendant's preliminary hearing that Defendant had moved into her house and had a key but explained that they lived together only when they first began dating. Ms. Brockington also clarified on cross-examination that Defendant, Mr. Widener and Mr. Dalton were all running when they entered her house on Mr. Widener's first visit. She agreed that Mr. Dalton egged the men on during their argument on the first visit, and told Defendant to come out of the house during their second visit. Ms. Brockington denied paging Mr. Widener so that he would return to her house. Ms. Brockington admitted that she went to Atlanta but denied that the purpose of her visit was to see Defendant although she did see Defendant while she was there.

Mr. Dalton testified that Mr. Widener was his best friend. He said that they often stopped by Ms. Brockington's house when he and Mr. Widener were driving around. The first time they stopped at Ms. Brockington's house on the evening of October 10, Mr. Dalton said that they were just visiting. He did admit that there was "a little bit of an argument," and Mr. Widener and Defendant started "fussing."

Mr. Dalton said that after he and Mr. Widener left Ms. Brockington's house the first time, the men drove around some more and drank beer. Mr. Widener's pager went off, and Mr. Widener turned the car around and drove back to Ms. Brockington's house. Mr. Dalton assumed the page was from Ms. Brockington. Mr. Widener parked in front of Ms. Brockington's house on the second visit and got out of the car first. Mr. Widener walked toward the house, but Mr. Dalton remained on the lawn about twenty-five feet from the front porch. Mr. Dalton did not remember seeing Ms.

Brockington outside. Mr. Widener started up the front steps, and Mr. Dalton said that he heard Defendant say, "Don't walk up on me." Mr. Widener said, "This is my cousin's house," and then the shooting began. Mr. Dalton was shot and he fled down the street. He told two women sitting on a porch of one of the neighborhood houses that he and his friend had been shot, and the women called the police and an ambulance. Mr. Dalton said that neither he nor Mr. Widener had a weapon and never threatened Defendant. He later conceded that Mr. Widener and Defendant were threatening each other while they argued.

On cross-examination, Mr. Dalton said that he heard one shot when he was hit and then two more shots while he was at the neighbor's house. He later conceded, however, that Ms. Brockington's and the neighbors' testimony that there were three shots in quick succession was probably the correct version. Mr. Dalton said that he did not know Defendant and had no idea why Defendant shot him. Although he denied it at first, Mr. Dalton said that he remembered telling Larry Vineyard, a detective with the Knoxville Police Department, that Defendant shot him because "he might have thought I had a gun on me." Mr. Dalton also agreed that he told Detective Vineyard that "I guess [Defendant] thought we might was going to do something to him." Mr. Dalton testified that he weighed about 198 pounds at the time of the shooting.

Sandie Johnson said that she was Ms. Brockington's best friend, and she had come over to Ms. Brockington's house on October 10 because the two women were going to a party. Ms. Johnson said she did not really know Defendant but knew that he was Ms. Brockington's boyfriend. Ms. Johnson said that Ms. Brockington told her that Defendant's last name was "Parks" after the shooting.

Ms. Johnson was going through some shoes in the bedroom closet when Mr. Widener and Mr. Dalton arrived the first time. The bedroom door was pushed open, knocking Ms. Johnson into the closet. Ms. Johnson heard arguing, and said Mr. Widener was mad at both Defendant and Ms. Brockington. Mr. Widener was upset over Defendant's presence in Ms. Brockington's house. Ms. Johnson said that Defendant did not like Mr. Widener confronting him and reacted defensively to Mr. Widener's arguments. Ms. Johnson did not hear any threats on the first visit. After the two men left, Ms. Johnson said that Defendant was still upset and was pacing back and forth. She saw Defendant make one telephone call. Ms. Brockington tried to calm Defendant down and keep him from leaving the house to find Mr. Widener. Robert Taylor, a friend of Defendant's, arrived before Mr. Widener returned.

Ms. Johnson said she was in the bedroom with Ms. Brockington when Mr. Widener and Mr. Dalton drove back to the house. Ms. Johnson said that Ms. Brockington went outside to stop Mr. Widener from entering the house, and she heard Defendant say "Don't come up on this porch." Ms. Johnson said that Defendant held a gun behind his back while he stood at the front door. When Ms. Johnson saw the gun, she went back into Ms. Brockington's bedroom and tried to call 911. She heard three or four shots before the call was completed. Defendant came into the bedroom, the gun still in his hand, and told Ms. Johnson to put down the telephone. Ms. Johnson said that Defendant was using the telephone when she left the bedroom.

On cross-examination, Ms. Johnson admitted that Mr. Widener was mad during the first visit, and Mr. Dalton was "rowdy" and egging on the confrontation between Defendant and Mr. Widener. She agreed that she told Detective Vineyard that Mr. Widener and Mr. Dalton had tried "to gang" Defendant. Ms. Johnson could not see whether Mr. Widener or Mr. Dalton had weapons on the second visit. Ms. Johnson said that both Mr. Widener and Mr. Dalton were bigger than Defendant at the time of the shooting.

On redirect, Ms. Johnson said that she thought that Mr. Widener was not carrying a weapon on the second visit because he was not wearing a shirt, and he had his hands up in the air when he approached the house. On recross, however, Ms. Johnson said that Ms. Brockington was standing in front of Mr. Widener, and Mr. Widener appeared to be gesturing with his hands, rather than holding them up.

Robert Taylor testified that he received a telephone call from Defendant on the evening of October 10. Defendant told him that there was some trouble and asked him to come over to Ms. Brockington's house. When he arrived at the house, Defendant was still mad. Mr. Taylor asked him why he did not leave, but Defendant just "stood there." Ms. Brockington came into the living room and started talking to Defendant. When a car drove up, Mr. Taylor said that Ms. Brockington went outside. Mr. Taylor said that he heard Ms. Brockington tell Mr. Widener that Defendant had a gun, and Mr. Widener replied that Defendant ought to use it. Mr. Taylor kept backing away from the door. He said that Defendant opened the front door and stepped out on the porch. Mr. Taylor said that Defendant pulled a gun from the back of his trousers, and started shooting. Mr. Taylor said that after the shooting, Defendant stepped over Mr. Widener and went to the sidewalk and looked around. Mr. Taylor said that Mr. Widener had fallen so that the upper part of his body was inside the house. On cross-examination, Mr. Taylor said that Mr. Widener would not have been able to see Defendant's gun as he approached Ms. Brockington's house.

Keithy Smith testified that he received a telephone call from Defendant about 3:00 a.m. to 4:00 a.m. on October 11. Defendant told him that he had parked his car in Mr. Smith's backyard, and someone would retrieve the car at a later time. Defendant told Mr. Smith that he had shot "them two f_ _ _ _ _ _ g  n_ _ _ _ rs." Mr. Smith called the Knox County Police Department around 5:25 a.m. and spoke with Detective Vineyard about Defendant's telephone call. Mr. Smith told Detective Vineyard that Defendant had called from Atlanta, Georgia.

Detective Vineyard responded to the call about the double shooting at Ms. Brockington's house. When he arrived at the house, Defendant was gone. Mr. Widener was laying on the porch, with his feet toward the front yard and his head toward the front door. Mr. Widener had been shot in the chest but was still alive when Detective Vineyard arrived, and the paramedics were administering assistance to him. Mr. Dalton was discovered down the street where he had collapsed in a neighbor's yard. Mr. Dalton, too, had been shot in the chest. Detective Vineyard said that Defendant was apprehended in Atlanta two years after the shooting.

Dr. Henry S. Nelson, Jr., was the attending physician at The University of Tennessee Hospital on October 10. When Mr. Widener was brought into the emergency room, his blood pressure was very low, and he was taken to surgery. During an exploratory laparotomy, Dr. Nelson discovered that the bullet had injured Mr. Widener's colon and the aorta above the celiac artery. Dr. Nelson said that Mr. Widener had no chance of surviving the bullet wound, and he died on the operating table during surgery.

Dr. Nelson said that Mr. Dalton had also suffered a gunshot wound to the chest. The bullet pierced Mr. Dalton's small bowel, injured his colon on the right side and exited the abdomen on the right side through the iliac crest. Dr. Nelson said that Mr. Dalton's injuries were also life threatening.

On cross-examination, Dr. Nelson said that Mr. Dalton weighed about 195 pounds. Mr. Widener was 72 inches tall and weighed approximately 200 pounds. Dr. Nelson said that his files indicated that Mr. Widener's serum alcohol level was 196 and Mr. Dalton's serum alcohol level was 296 which he indicated was very high.

Dr. Sandra Elkins, the Knox County Medical Examiner, performed Mr. Widener's autopsy. She confirmed that he died as a result of a gunshot wound. Dr. Elkins testified that the stipple marks around the entry wound indicated that the gun was discharged less than twenty-four to thirty-six inches from the victim. The bullet traveled from left to right on a downward trajectory of 4.5 inches. Dr. Elkins said that the course of the bullet could be attributed to a number of situations, including the possibility that the shooter was standing above the victim, or the shooter was taller than the victim, or the victim was lying on his back on the ground.

On cross-examination, Dr. Elkins agreed that another cause for the downward course of the bullet was the possibility that the victim was bent over when he was shot. Dr. Elkins said that Mr. Widener's blood alcohol level was .07 when he was at the hospital. Dr. Elkins agreed, however, that this test reading was probably low because of the dilutional effects of the blood transfusions and IV fluids transmitted to Mr. Widener.

Donald Carmen, a TBI agent with the forensic firearms identification unit, testified that the two bullets recovered from the victims had rifling characteristics common to a .38 special and .357 magnum handgun. No casings were found at the scene.

## II. Sufficiency of the Evidence

Defendant argues that the jury failed to properly consider the facts and law when it rejected his defense of self-defense.

The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. Tenn. Code Ann. § 39-11-201(3). Whether or not a defendant acted in self-defense is a question for the jury to determine. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App.

1994) (citing *State v. Williams*, 784 S. W.2d 660 (Tenn. Crim. App. 1989)). It is for the jury to determine whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable and whether the defendant was without fault. *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995). "Thus, a defendant may expect only that the jury be properly instructed regarding the law of self-defense . . . thereby enabling the jury to correctly apply the law to the facts as it finds them." *Id.*

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the State in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

It is a defense to prosecution if a person's actions are justified as provided in Tennessee Code Annotated sections 39-11-601, *et seq*. Self-defense qualifies as a justification. Tenn. Code Ann. § 39-11-611; *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). As applicable in this case:

> (1) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

> (b) Any person using force intended or likely to cause death or serious bodily injury within the person's own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

Tenn. Code Ann. §§ 39-11-61l(a) and (b).

Defendant makes two assumptions in his argument. First, Defendant presumes that the only reason that the jury concluded that he did not act in self-defense was because Mr. Widener and Mr. Dalton did not actually enter Ms. Brockington's house on the second visit. He points out, however, that the men had unlawfully and forcibly entered the house fifteen minutes earlier, and it was reasonable for Defendant to assume that they were going to unlawfully enter on the second visit. Regardless of the merit of this argument, the jury could have concluded from the evidence that Mr. Widener, at least, was in the process of intruding into Ms. Brockington's residence without permission when he stepped onto the front porch. *See State v. Kevin Douglas Davis,* No. M2000-00017-CCA-R3-CD, 2001 WL 741930, at *5, n.2 (Tenn. Crim. App., Nashville, July 3, 2001) (citing *State v. Charles T. Edwards*, No. 01-C-019007CR00171, 1991 WL 165819, at *3 (Tenn. Crim. App., Nashville, Aug. 30, 1991) (Pursuant to a substantially identical predecessor statute, one's own home has been defined to include both the house and the curtilage thereof, including the home's porch)). We agree with the State's argument, however, that this factor was not the only basis upon which the jury could have concluded that Defendant was not acting in self-defense when he shot Mr. Widener and Mr. Dalton.

Defendant also presumes in his argument that he was a resident of Ms. Brockington's house. Viewing the evidence in a light most favorable to the State, Ms. Brockington testified that Defendant did not live with her and that he lived instead with a friend. Even assuming that Defendant moved into Ms. Brockington's home when he and Ms. Brockington first began dating, Ms. Brockington testified that the couple had not seen each other for two weeks prior to the shooting. The jury could have concluded from the evidence presented that Defendant and Ms. Brockington were in a dating relationship, and that Defendant did not reside at Ms. Brockington's house. As a result, the jury could have concluded that Defendant was not entitled to a presumption that he had a reasonable fear of imminent peril or serious bodily injury. Tenn. Code Ann. § 39-11-611(b).

Even assuming, however, that the jury found that Defendant was a resident of Ms. Brockington's house, the evidence in the record was sufficient to overcome any presumption that Defendant was in fear of imminent peril. Looking at Mr. Dalton's role in the incident first, there was no evidence that Mr. Dalton was armed or that he made any threatening moves towards Defendant on the second visit other than Ms. Brockington's admission that Mr. Dalton called out once or twice for Defendant to come out of the house. Instead, Mr. Dalton stood by Mr. Widener's car during the entire incident. As to Mr. Dalton, the evidence is sufficient to support the jury's conclusion beyond a reasonable doubt that Defendant did not act in self-defense when he shot Mr. Dalton.

The testimony of Ms. Brockington, Ms. Johnson and Mr. Taylor indicated not only that Defendant was not afraid of Mr. Widener, but that he was enraged at what he perceived to be Mr. Widener's disrespect. During the first visit, Defendant argued back and did not retreat from Mr. Widener's and Mr. Dalton's aggression. Only Ms. Brockington's intervention prevented a fight from ensuing. During the fifteen minute interval between the two visits, Defendant remained angry and called two of his friends, "Skull" and Robert Taylor, to come over to Ms. Brockington's house. When Mr. Widener returned, Defendant armed himself with a gun and watched Mr. Widener walk up the sidewalk from behind the closed security door. Mr. Widener was not wearing a shirt and his

hands were visible. Based on this evidence, the jury could have concluded that Defendant did not believe that he was in imminent danger from Mr. Widener, and Defendant's reaction to Mr. Widener's presence at Ms. Brockington's house was motivated by anger instead of fear.

Alternatively, even if the jury inferred from the evidence that Defendant reasonably believed he was in imminent danger, the jury could have concluded that Defendant's use of a gun was beyond the force reasonably necessary to protect himself. *See* Tenn. Code Ann. § 39-11-611, Sentencing Commission Comments. There was no evidence that the victims had weapons at any point during the night. Mr. Widener was not wearing a shirt and was gesturing with his hands as he approached the porch. Although there was testimony that both Mr. Widener and Mr. Dalton were bigger than Defendant, Defendant showed no sign that he was intimidated by the two men's physical size or that he feared a physical confrontation. Ms. Brockington testified that Mr. Widener walked toward the porch, and did not charge or run toward Defendant. Mr. Dalton remained near the street by Mr. Widener's car and displayed no signs of a weapon. The force used in self-defense must be reasonable in view of all the circumstances surrounding the incident. *Renner*, 912 S.W.2d at 704. The jury was charged with the responsibility of determining whether Defendant believed that he was in imminent danger and whether the force used was reasonable. *Id*.

As stated above, this Court may not reweigh or reevaluate the evidence. *Bland*, 958 S.W.2d at 659. Based on the totality of the evidence presented in this case, we find that the evidence is sufficient from which a jury could conclude beyond a reasonable doubt that Defendant did not act in self-defense when he shot Mr. Widener and Mr. Dalton.

Alternatively, Defendant argues that the State did not carry its burden of proving that he acted with premeditation, and the evidence, therefore, supports, at best, only a conviction of second degree murder. The State contends that Defendant's issue is waived because he does not provide any argument in support of his position other than a reference to the trial court's observation that the issue of premeditation was "an extremely close situation." *See* Tenn. R. App. P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b).

Defendant limits his argument to the conviction for first degree murder, but we have also reviewed the record for sufficient evidence of premeditation regarding the conviction of attempted first degree murder. Considering the proof in a light most favorable to the State, a rational jury could have concluded, based on the facts presented to it, that Defendant, acting after the exercise of reflection and judgment, consciously engaged in the conduct that led to Mr. Widener's death and the attempted first degree murder of Mr. Dalton.

As the State points out, Defendant did not deny that he shot Mr. Widener. Rather, he argued that he acted in self-defense and thus his conduct was justified. Once the jury rejected self-defense as a valid justification, Defendant makes no reference to the record which would support his argument that he acted without premeditation.

First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). The statute continues:

> As used in subdivision (a)(1), "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* -202(d).

Whether Defendant acted with premeditation is a question for the jury. *State v. Holder*, 15 S.W.3d 905, 914 (Tenn. Crim. App. 1999). Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn.1997)). In *Bland*, the supreme court outlined several factors which may support a finding of premeditation which include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660; *State v. Bush*, 942 S.W.2d 489, 501 (Tenn. 1997).

When viewed in a light most favorable to the State, the evidence reveals that fifteen minutes elapsed between Mr. Widener's two visits to Ms. Brockington's home. During that interval, Defendant continued to fume over Mr. Widener's perceived disrespect for Defendant. Defendant called two of his friends to tell them about the argument and told them to come over to Ms. Brockington's house. When Mr. Widener returned, Defendant armed himself with a gun and waited behind the security door until Mr. Widener reached the house. Mr. Widener was unarmed and his hands were visible, and his approach to the house was not threatening. When Mr. Widener climbed the front steps, Defendant opened the front door, stepped out on the porch and fired three shots in quick succession, hitting both Mr. Widener and Mr. Dalton in the center of their chests. After the shooting, Defendant gathered up his duffle bag, stepped over the victim, and told Ms. Brockington he was sorry. Defendant got in his car and drove it to Mr. Smith's house where he hid it in Mr. Smith's back yard. Defendant then fled to Atlanta where he called Mr. Smith and told him he had killed the victim. The evidence in the record is sufficient to establish that Defendant acted with premeditation as to both offenses, first degree murder and attempted first degree murder.

## III. Jury Instruction on Flight

Defendant argues that the prosecutor's repeated references during closing argument to his flight to Georgia as well as the prosecutor's misstatement of the inferences which the jury could draw from such conduct denied Defendant a fair trial. The State argues that Defendant did not make

a contemporaneous objection to the prosecutor's comments during closing argument, and the issue is thus waived under Rule 36(a) of the Tennessee Rules of Appellate Procedure.

Although defense counsel did not object to the prosecutor's statements on flight at the time the statements were made, the issue of prosecutorial misconduct during closing argument was raised in Defendant's motion for new trial. *See* Tenn. R. App. P. 3(e). At the conclusion of the hearing on Defendant's motion, the trial court agreed that the State during its closing argument may have misstated the inferences to be drawn from Defendant's flight and placed too much emphasis on Defendant's conduct after the shooting. The trial court concluded, however, that the jury was correctly instructed as to the inferences that could be drawn from Defendant's flight and was sufficiently cautioned that the arguments and remarks of counsel are not the law. Defendant concedes that he did not object to the form or substance of the trial court's charge to the jury on flight because applicable law supported the instruction.

Defendant counts twenty-five references by the prosecutor to his flight to Atlanta during closing argument. Defendant also submits that the prosecutor misstated the inferences that can be drawn from a defendant's flight. At one point, the prosecutor said,

> This is huge! He fled after the crime! And the Judge is going to instruct you on the law. You can justify an inference of guilt – of guilt from that alone, he fled! Does an innocent man flee? Does a man who's in fear for his life flee this jurisdiction and for two years hang out clipping hair, grooming dogs? This alone is huge!

At another point, the prosecutor commented,

> [The Judge is] going to – presumably she's going to read to you the instruction on the law that you can infer his guilt from his flight. You can infer that. It justifies the inference. Guilty men flee.

Defendant argues that the prosecutor's comments improperly imply that the jury may infer guilt solely from the fact that a defendant's flees after the offense. The pattern jury instruction which was provided to the jury states that

> [t]he flight of a person accused of a crime is a circumstance which, when considered with all the facts in the case, may justify an inference of guilty. . . . If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by the defendant may be caused by a consciousness of guilty, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant . . . ."

T.P.I.–Crim. § 42.18.

Defendant also contends that the trial court, itself, misunderstood the implications of a defendant's flight and submits that if the trial court was confused, then the jury was most likely also confused. During the hearing on Defendant's motion for a new trial, the trial court observed,

> The jury had to infer that because of the flight of Mr. Williams that he was guilty of the offense, and that was the instruction that was given to the jury. Now whether or not that was an overemphasis or the Court placed too much emphasis on it, I don't think that is for me to decide at this point. And I am going to again decline to decide that issue, but it certainly is an issue that someone should look at, particular [sic] in this situation. This is a close case.

Defendant extracts these comments out of context. When the observations were made, the trial court was enumerating the various inferences that the jury must have drawn in order to find Defendant guilty of first degree murder to the exclusion of the lesser included offenses, including an inference from his flight to Georgia that Defendant was guilty of the offense. The trial court went on to find that the totality of the evidence was sufficient to support the jury's verdict.

Closing argument is a valuable privilege for both the State and the defendant, and our courts have generally extended counsel wide latitude in arguing their case before the jury. *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1994). Consequently, trial judges are also accorded wide discretion in their control of closing argument, and this discretion will not be disturbed on appeal in the absence of abuse. *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975); *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). Closing argument, however, "must be temperate, based upon the evidence at trial, relevant to the issues being tried, and not otherwise improper under the facts or the law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)). This Court has previously recognized that "[i]t is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." *Id.* (citations omitted). *See also State v. Phillpott*, 882 S.W.2d 394, 408 (Tenn. Crim. App.1994); *State v. Hicks*, 618 S.W.2d 510, 519 (Tenn. Crim. App. 1981).

A fair reading of the prosecutor's comments, which Defendant highlighted in his argument, does suggest that the jury could justify a finding of guilt on the presence of flight alone, an inference that is not supported by either the law or the pattern jury instruction. *See State v. Smith*, 893 S.W.2d 908, 918 (Tenn. 1994) (Flight alone is insufficient to prove guilt); *State v. Richardson*, 995 S.W.2d 119, 128-29 (Tenn. Crim. App.1998). To merit a new trial, however, the conduct must be so improper or inflammatory as to affect the verdict. *Goltz,* 111 S.W.3d at 5 (citing *Harrington v. State*, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965)). In measuring the prejudicial impact of the questioned comments, this Court should consider: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." *Id*. (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

The evidence at trial showed that Defendant left Knoxville after the shooting and traveled to Georgia where he remained for two years until he was apprehended. The prosecutor's references to Defendant's conduct after the shooting were permissible comments on facts contained within the record. The prosecutor's explanation of the inferences to be drawn from Defendant's flight, although inaccurate, do not rise to the level of prejudicial error considering all the facts and circumstances of the case. The trial court properly instructed the jury that flight alone was not sufficient to justify a finding of guilt but could be considered along with all the other evidence to justify a verdict of guilty, and that the weight to be placed on Defendant's flight was a question solely for the jury. This coupled with the evidence of Defendant's guilt renders any error harmless.

Defendant also requests as a general proposition that this Court either abandon the practice of providing a flight instruction or, if the flight instruction remains viable, also require that an instruction as to the absence of flight be provided if warranted by the evidence. Defendant contends that permitting the prosecution to have the benefit of a flight instruction while denying a defendant the right to use an "absence of flight" instruction violates due process and our fundamental notions of fairness. Be that as it may, any changes must come from our supreme court, not this Court.

The supreme court has already concluded that Tennessee law allows an instruction as to the inferences to be drawn from a defendant's flight notwithstanding the criticism leveled at such an instruction by other state courts. *State v. Harris*, 839 S.W.2d 54 (Tenn. 1992). This Court must follow the decisions of our supreme court. *State v. Burton*, 751 S.W.2d 440, 449 (Tenn. Crim. App. 1988). Accordingly, this Court has held that "[b]ecause this State subscribes to the majority view approving the [flight] instruction under appropriate circumstances, this Court must hold, even in the face of a well-reasoned minority trend, that the jury charge on the issue of flight was not error. *State v. Payton,* 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989). *See also State v. Kendricks*, 947 S.W.2d 875 (Tenn. Crim. App. 1996) (a jury instruction on flight is proper if warranted by the evidence). This Court has also previously determined that the opposite is not applicable, and a defendant is not entitled to an instruction when he does not flee. *State v. Thomas E. Chambers*, No. 03C01-9902-CR-00054, 1999 WL 1059969, *4 (Tenn. Crim. App., Knoxville, Nov. 23, 1999), *perm. to appeal denied* (Tenn. 2000) (citing *Holt v. State*, 591 S.W.2d 785, 791 (Tenn. Crim. App. 1979)). Defendant is not entitled to relief on this issue.

## CONCLUSION

Following a thorough review of the record, including the briefs and arguments of counsel, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-13-